IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

FEDERAL DEPOSIT INSURANCE CORPORATION
as Receiver for WILLIAMSBURG FIRST NATIONAL BANK,

     Plaintiff,

vs.                               Case No.: _____

ALAN K. CHANDLER, MARION B. LEE, JR., JIM M.
CHERRY, JR., RONALD K. HAMMOND, JAMES R.
MCDONALD, HOLMES E. (MARTY) MARTIN, AND D.
JONATHAN ODOM,

     Defendants.

## COMPLAINT

The Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for

Williamsburg First National Bank, Kingstree, South Carolina ("FDIC-R"), for its complaint

states as follows:

## I.    <u>INTRODUCTION</u>

1.    The FDIC-R seeks to recover tort damages resulting from the negligence, gross

negligence, and breaches of fiduciary duties of former Williamsburg First National Bank

("WFNB" or "the Bank") directors and officers Alan K. Chandler, Marion B. Lee, Jr., Jim M.

Cherry, Jr., Ronald K. Hammond, James R. McDonald, and D. Jonathan Odom.  The FDIC-R

also seeks to establish the amount of damages resulting from the negligence, gross negligence

and breaches of fiduciary duties of Holmes E. (Marty) Martin who is named as a nominal

defendant solely for purposes of establishing liability in connection with an insurance policy

1

issued by Fidelity and Deposit Company of Maryland.   The FDIC-R does not seek to recover

personal assets from Mr. Martin.  Mr. Martin and the other named directors and officers are

referred to collectively herein as "Defendants."

2.      Defendants breached their fiduciary duties and were negligent and grossly

negligent by, among other things, originating and/or approving at least 16 transactions between

August 2007 and August 2008 ("Subject Transactions"), in violation of the WFNB Loan Policy

as well as prudent lending practices.  Defendants agreed to lend over $9.06 million to borrowers

without, among other things, adequately analyzing the creditworthiness of the borrowers and

guarantors, without establishing the borrowers' proposed real estate projects were feasible or

likely to result in repayment, and without identifying any reasonably reliable and adequate

sources of repayment.

3.      The Defendants' negligence, gross negligence, and breaches of their fiduciary

duties caused substantial damages, in an amount to be established at trial, but not less than

$5.674 million.  Defendants are jointly and severally liable for the damages they caused in

violating the Bank's policies and prudent banking practices.  In this lawsuit, the FDIC-R does

not seek to collect upon outstanding loans, but rather seeks to collect damages flowing from the

Defendants' negligence, gross negligence, and breach of fiduciary duties.

## II.      PARTIES

### A.      Plaintiff

4.      The FDIC is a corporation organized and existing under the laws of the United

States of America.  12 U.S.C. §§ 1811-1835a.  The FDIC is an instrumentality of the United

States of America and is charged with, among other duties, the orderly liquidation of failed

banks. 12 U.S.C. § 1821(c)(2)(A)(ii). WFNB was a national bank, and its deposits were insured by the FDIC.

5.      On or about July 23, 2010, the Office of the Comptroller of the Currency ("OCC") closed WFNB and named the FDIC as Receiver, and the FDIC-R is the plaintiff herein. Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded to all rights, titles, powers, and privileges of WFNB and its depositors, account holders, other creditors, and stockholders.

**B.    Defendants**

6.      Alan K. Chandler ("Chandler") joined WFNB in 1983 and held positions as a Loan Officer, Assistant Vice President, and Vice President before being promoted to President and CEO in May 2006. Chandler was elected to the board of directors (the "Board") in December 2005, and beginning in May 2006 was also a member of the Director's Loan Committee, variously referred to as the Loan Committee, Discount and Investment Committee, or L&D Committee ("Loan Committee"). Chandler served in these positions until WFNB failed. Chandler resides in Kingstree, South Carolina.

7.      Jim M. Cherry, Jr. ("Cherry") was the Bank's President and CEO from 1985 until he retired in April 2006, a member of WFNB's Board from 1985 until the Bank failed, and was a member of the Loan Committee at all relevant times. Cherry resides in Kingstree, South Carolina.

8.      Marion B. Lee ("Lee") joined WFNB's Board in 1994 and served as Chairman of the Board from December 2005 until WFNB failed. Lee also was a member of the Loan Committee at all relevant times. Lee resides in Hemingway, South Carolina.

3

9.      Ronald K. Hammond ("Hammond") served on WFNB's Board from 1999 until WFNB failed and was a member of the Loan Committee at all relevant times. Hammond resides in Kingstree, South Carolina.

10.     Chandler, Cherry, Lee, and Hammond are hereinafter sometimes collectively referred to as the "Director Defendants."

11.     James R. McDonald ("McDonald") was hired by WFNB on May 4, 2005 to be City Executive and Branch Manager of the Bank's new branch in Florence which opened in June 2005. McDonald was the primary lender and credit contact with that branch. McDonald served in that capacity until his resignation effective June 30, 2008. McDonald resides in Lake City, South Carolina.

12.     Holmes E. (Marty) Martin ("Martin") was the Regional Manager of the Florence branch from September 2007 until September 2009. Martin resides in Newport News, Virginia.

13.     D. Jonathan Odom ("Odom") joined WFNB in May 2005 as an Assistant Branch Manager of the Florence branch and also became a Loan Officer in April 2006. On August 13, 2008, Odom took over McDonald's job as Branch Manager for the Florence branch and became an Assistant Vice President, a position he held until WFNB failed. Odom resides in Florence, South Carolina.

### III.   JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this matter pursuant to 12 U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331 and 1345.

15.     The Court has personal jurisdiction over the Defendants who at all relevant times were residents of, and conducted business in, the State of South Carolina.

4

16.    Venue is proper under 28 U.S.C. § 1319(b), as all or substantially all of the events and/or omissions giving rise to the claims asserted herein occurred in this District.

## IV.    FACTUAL BACKGROUND

### A.    History of the Bank

17.    WFNB was established in 1958 as Williamsburg State Bank and converted to a national charter in 1966. The Bank operated five locations and served Florence, Williamsburg, and Georgetown counties in South Carolina. WFNB was owned by Williamsburg First National BancShares, Inc., a privately-held, one-bank holding company based in Kingstree, South Carolina. The holding company was established in 1986 and had no subsidiaries or affiliates.

18.    In June 2005, the Bank expanded its lending into Florence, a new market for the institution, and hired McDonald to head its new Florence branch. The Bank then departed from its traditional business model and began to pursue an aggressive growth strategy focused on acquisition, development and construction ("ADC") and commercial real estate ("CRE") loans.

19.    The Director Defendants grew WFNB's assets by almost 23% in 2005, 13% in 2006, and almost 14% in 2007. WFNB's asset growth rate during this time far exceeded the rate for banks in WFNB's peer group which grew by 5% in 2005, 6.5% in 2006, and 6.3% in 2007. This growth included the Subject Transactions which were poorly underwritten and made in violation of laws, regulations, and the Bank's Loan Policy as described below.

20.    The Bank was subject to the supervision of the OCC. Examiners from the OCC conducted regular examinations of the Bank. Before any of the Subject Transactions were approved, examiners found and reported to the Director Defendants many of the loans they reviewed contained exceptions to the Bank's Loan Policy and directed management to reduce

this level. Seven of the Subject Transactions were approved after examiners had warned that it was essential to adhere to a sound loan policy and to conduct a global financial analysis of borrowers and guarantors.

**B.    Loan Policy**

21.    The Bank's Loan Policy ("Loan Policy") set forth the responsibilities of the loan officers and directors in making loans and the specific requirements for loans based on type of loan.

22.    The Loan Policy required Chandler, McDonald, Odom, and Martin, as loan officers, to be responsible for each loan they made, regardless of whether other individuals or the Loan Committee had approved the loan. The Loan Policy also set forth their specific responsibilities, including:

  a.    Ensuring all loan decisions, actions and recommendations are based on an accurate and thorough understanding of each customer's financial needs and conditions;

  b.    Properly administering the credit worthiness of all loans which the officer originated; and,

  c.    Ensuring that any proposals and approvals of any extensions of credit are in compliance with the Loan Policy, as well as with specific procedures adopted by the Bank and all applicable laws and regulations.

23.    The Loan Policy also provided that each loan officer was responsible for loans made by an officer under his supervision, and was required to exercise reasonable control over the loans made by subordinates. Accordingly, the Loan Policy required McDonald to be responsible for and to exercise reasonable control over each loan made by his subordinates Odom and Martin and required Chandler to be responsible for and to exercise reasonable control

over each loan made by McDonald and, after McDonald resigned, to be responsible for and to exercise reasonable control over each loan made by Odom.

24.     The Loan Policy limited a loan officer's exercise of lending authority to those areas in which the officer was proficient and knowledgeable.

25.     To obtain approval for a loan where the Bank's aggregate credit to the borrower exceeded $50,000 the Loan Policy required a Report of Loan or Line ("RLL") be completed, an internal bank document that was to include details of the loan being considered and all information from documents supporting the loan.  The Loan Policy required all items on the RLL be completed or marked not applicable, and all approvals be noted, reflecting approving officer and director initials and dates of approval.

26.     Pursuant to the Loan Policy, all CRE and ADC loans required:

    a.     a current, independent appraisal;

    b.     a 20% equity contribution from the borrower;

    c.     a borrower with a positive tangible net worth and cash flow;

    d.     a debt service coverage of 1.2:1;

    e.     guarantors with the financial capacity to repay the debt if the borrower is a closely held corporation, partnership, or limited liability company;

    f.     take-out letters from the permanent lender if WFNB did not commit to permanent financing; and

    g.     assignments of any leases.

27.     The Loan Policy limited the loan-to-value ("LTV") ratio to 65% for raw land loans; 75% for land development loans; and 80% for commercial, one-to-four family, multifamily, and residential construction loans.

7

28.    The Loan Policy required all real estate loans to be conservatively margined, and the amount of such loans could under no circumstances exceed 85% of the lower of the purchase price or the appraised value of the real estate unless specifically approved by the appropriate level of lending authority.

29.    All exceptions to the Loan Policy had to be noted on the RLL and had to be approved by the President or Chief Credit Officer, the Loan Committee, or the Board depending on the borrower's total aggregate credit at the Bank.  Exceptions could only be granted based on strong net worth and/or excellent repayment capacity, excellent repayment history, additional collateral, and/or financially strong co-signors.

**D.    Loan Committee**

30.    The Bank's loan officers had authority to approve loans in amounts that ranged from $2,500 to $125,000, depending on their position and experience.  The Loan Policy required the Loan Committee to review loans approved by the loan officers on a bi-weekly basis.  The Loan Committee, comprised of the four Director Defendants, had authority to approve loans to borrowers with an aggregate credit up to $500,000.  Approval by two Loan Committee members was sufficient to approve a loan.

31.    Board approval was required for all loans where a borrower's aggregated credit was greater than $500,000.  A majority (five) of the nine-member Board was required to approve such loans.  However, the Loan Policy provided

> …loans requiring Board approval may be presented to the Loan Committee.  If three or more Committee Members are in favor of the loan, without any dissenting votes, it may be approved by a telephone poll for remaining votes.  Loans approved in this manner need not be presented to the full Board for approval.

8

A loan typically was not presented to the full Board if all four members of the Loan Committee had approved it. Instead, Board approval was obtained by getting one of the non-Loan Committee Board members to consent to the loan.

## V.    DEFENDANTS CAUSED DAMAGES

32.    The 16 Subject Transactions described below illustrate the failures, breaches, and violations of duty committed by the Defendants that resulted in damages. The FDIC-R seeks compensatory damages and other relief as a result of Defendants' conduct, including as described below.

33.    The Loan Committee approved all 16 of the described Subject Transactions. The four Director Defendants were the members of the Loan Committee when all the Subject Transactions were approved and each approved at least 15 of the Subject Transactions.

34.    Based on the information presented in the loan documentation and approval packages submitted to Defendants and the glaring red flags that this information raised, Defendants knew or should have known that the Subject Transactions should not have been recommended or approved. Since the Director Defendants comprised the Loan Committee, they were aware of the regulatory warnings concerning the poor underwriting and, with this additional knowledge, were on notice they should have conducted an even more careful review of all loans that came before them. The Defendants' negligence, gross negligence and breaches of fiduciary duties in connection with the Subject Transactions have caused damages to the FDIC-R.

35.    All the Subject Transactions were originated in the Florence office, 10 by McDonald. Quarter after quarter, internal reports provided to the Director Defendants showed McDonald had significantly more exceptions than the other loan officers. McDonald's

exceptions exceeded the Bank's goal of no more than 2% by as much as twenty times that amount. In fact, McDonald's exceptions exceeded the average percentage of exceptions for all of the other WFNB loan officers combined. Given the high exception rate which persisted throughout McDonald's employment, the Director Defendants' reliance on information presented by McDonald was unwarranted and unreasonable.

36.    Three of the Subject Transactions were originated by Martin. Martin had no background, meaningful training, or experience in originating real estate loans, particularly ADC, CRE and hotel loans. The Director Defendants were aware of Martin's lack of knowledge and experience and thus any reliance by them on information presented by Martin in connection with these loans was unwarranted and unreasonable.

37.    Two of the Subject Transactions were originated by Odom. Odom had no background, meaningful training, or experience in originating CRE and in particular hotel loans. The Director Defendants were aware of Odom's lack of knowledge and experience and thus any reliance by them on information presented by Odom in connection with these loans was unwarranted and unreasonable.

38.    The Subject Transactions which evidence the Defendants' negligence, gross negligence, and breaches of fiduciary duty are included in the chart below and described in further detail in the paragraphs that follow. The chart below summarizes each Defendant's role with respect to each of the Subject Transactions:

| Borrower | Transaction Date | Directors (d)/Officers (o) Approvals x=approved o=loan officer | | | | | | | Amount | Damages[1] |
| | | Chandler (o) | Cherry (d) | Hammond (d) | Lee (d) | Martin (o) | McDonald (o) | Odom (o) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Borrower A[2] | 9/7/07 | x | x | | x | | o | | $130,748 | $119,486 |
| Carolina Lodging | 5/22/08 | x | x | x | x | | | o | $1,252,549 | $597,000 |
| Financial Independence Ministries, LLC | 8/12/08 | x | x | x | x | | | o | $79,686 | $78,477 |
| Global Works LLC | 9/24/07 | x | x | x | x | | o | | $109,149 | $86,198 |
| Global Works LLC | 11/8/07 | x | x | x | x | | o | | $574,749 | $577,891 |
| Global Works LLC | 1/14/08 | x | | x | x | | o | | $300,744 | $138,000 |
| JB&G Holdings | 10/3/07 | x | x | x | x | | o | | $202,134 | $199,619 |
| Borrower B | 3/31/08 | x | x | x | x | o | | | $343,498 | $271,433 |
| Borrower C | 7/9/08 | x | x | x | x | o | | | $1,378,149 | $800,000 |
| Borrower D | 8/2/07 | | x | x | x | | o | | $252,649 | $94,038 |
| Borrower E | 12/19/07 | x | x | x | x | | o | | $30,098 | $29,920 |
| DAR Realty | 2/25/08 | x | x | x | x | | o | | $20,098 | $20,197 |
| DAR Realty | 4/1/08 | x | x | x | x | | o | | $433,163 | $327,500 |
| Security Builders | 11/14/07 | x | x | x | x | | o | | $534,600 | $213,726 |

[1] Damages do not include any prejudgment interest that may be available.
[2] Borrowers A, B, C, D and E referenced herein represent individual borrowers whose names have been withheld to protect their privacy. The names of these borrowers will be provided once an appropriate protective order is in place.

11

| Borrower | Transaction Date | Directors (d)/Officers (o) Approvals x=approved o=loan officer | | | | | | | Amount | Damages[1] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Chandler (o) | Cherry (d) | Hammond (d) | Lee (d) | Martin (o) | McDonald (o) | Odom (o) | | |
| SITUS Preferred Locations | 6/22/08 | x | x | x | x | o | | | $1,845,909 | $558,650 |
| Turkey Creek Development, LLC | 3/28/08 | o x | x | x | x | | | | $1,574,399 | $1,562,394 |
| **Totals** | | | | | | | | | **$9,062,322** | **$5,674,529** |

## Turkey Creek Development, LLC

39.     Pursuant to the recommendation of Chandler and approval of Cherry, Hammond and Lee, on March 28, 2008, a $1,574,399 two-year real estate development loan was extended to Turkey Creek Development, LLC ("Turkey Creek").  One of the principals of Turkey Creek was the cousin of WFNB director William Kellahan.  Kellahan's engineering firm provided engineering services for the Turkey Creek development and was paid from the loan proceeds.  The stated purpose of the loan was "business expenses," which Chandler's RLL identified as up to $600,000 to allow the Turkey Creek members to cash out equity they had injected into this residential development project and the remainder to fund "future project costs" in connection with the development of 233 acres of land.  Over $1 million was distributed to the borrower at the loan closing.

40.     The repayment terms required only quarterly payments of interest with the principal due at the end of the two years.  The loan was secured by a second mortgage behind a

$4 million land acquisition loan on the property that was funded six months earlier by another bank. The primary source of repayment was the sale of lots in the development; however the first mortgage holder was to receive all of the net sale proceeds until its $4 million land acquisition loan was repaid.

41.     The actions of Chandler in originating, and Cherry, Hammond, and Lee in approving the Turkey Creek loan were negligent, grossly negligent, breached their fiduciary duties, and were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, failure to undertake or require an adequate pre-approval credit analysis of the borrower and guarantors, an inadequate pre-approval analysis of the project, failure to comply with the prudent underwriting standards set forth in the Loan Policy and the regulatory Interagency Guidelines for Real Estate Lending (12 C.F.R. Part 34, Subpart D, App A) ("Regulatory Guidelines) and the failure to comply with the Board's underwriting standards of acceptable risk, particularly in light of the risk created by the structure of the loan – a second mortgage development loan on a project that lacked infrastructure financing – and in light of the declining real estate market.

42.     In addition to the Loan Policy's requirement that a sound credit analysis be done prior to approving the loan, the Loan Policy specifically required that Chandler, as the originating loan officer, ensure that his loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions. The Loan Policy also set forth specific underwriting standards to identify the level of risk acceptable to the Board and required the approval of each real estate loan to consider the borrower's capacity to service the debt, the overall credit worthiness of the borrower, the value of the mortgaged property, and all

13

other relevant credit features.  The origination and approval of the Turkey Creek loan violated

these Loan Policy requirements as evidenced by, among other things, the following:

a.  The Director Defendants knew the loan failed to comply with prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the information provided in the RLL was not sufficient to determine the adequacy of the borrower's capacity to service the debt or accurately assess the level of risk.

b.  Although Chandler's RLL disclosed the borrower had a loan from another bank, the Director Defendants knew the RLL did not reflect the terms of this other loan, which information was necessary for a proper analysis of the loan.  The loan from the other bank was only for land acquisition and it was only an interim loan with terms of quarterly interest with the $4 million principal due in September 2009, six months before the proposed WFNB loan was due.

c.  Chandler's RLL failed to disclose the expenses being funded were soft costs only and included $214,000 for interest and $213,000 for engineering fees to be paid to director Kellahan's engineering firm.

d.  The Director Defendants knew there was no adequate source of repayment for this loan.  The primary source of repayment was the sale of the developed lots, however there was no source of funding to complete the project infrastructure, estimated by the borrower to be from $2.5 million to $7.64 million. Without funding for roads, utilities, and other hard costs of infrastructure, the sale of lots was not a realistic repayment source.

e.  The Director Defendants knew or should have known that Turkey Creek's net worth was largely illiquid with real estate comprising 99.7% of total assets.

f.  Although Chandler's recommendation relied on the guarantors' net worth, Chandler only provided the total stated net worth of $32,342,248 from their financial statements.  Chandler did not disclose that $10 million of this net worth amount was based on two of the guarantors listing their ownership in the borrower at a value of $5 million each.

g.  Chandler did not disclose the total liquid assets of the guarantors was only $767,000, with the remainder of their net worth comprised of interests in closely held companies or real estate.  In fact, illiquid assets comprised over 96% of total assets for each of the guarantors and Chandler took no steps to verify the asset values listed in the financial statements.

14

h.    The pre-approval analysis for this loan was inadequate. The Director Defendants knew there was no analysis of the personal financial statements and tax returns of the guarantors and no global cash flow analysis

i.    Chandler knew the value in the eight-month old appraisal used to calculate the LTV ratio was not reliable. The value was based on "comparative" land sales which included the sale of the subject property to Turkey Creek as one of six comparable sales; four of the remaining five comparable sales were over eighteen months prior to the appraisal date, with the remaining comparable sale being thirteen months old. Turkey Creek purchased the subject property for $36,564 per acre, yet the "as is" value in the appraisal was based on a value of $52,089 per acre – or over $15,500 more per acre than Turkey Creek paid for the property.

j.    The Loan Policy provided that the term of a land development loan "shall not exceed eighteen months" and prohibited the use of loan proceeds to pay interest payments unless specifically approved at origination. The Director Defendants' approval of this loan violated these requirements of the Loan Policy because the term of the loan was 24 months, and there was no approval to use the loan proceeds for interest, even though the proceeds paid interest on this loan as well as on the $4 million acquisition loan.

43.    The primary source of repayment was the sale of lots. No sale proceeds were available to repay the Bank until Turkey Creek sold 33 lots in order to generate enough net sale proceeds to pay off the $4 million acquisition loan. Moreover without completion of the infrastructure, for which there was no funding, it was virtually impossible to sell any lots. When the Turkey Creek loan matured in March 2010, only five lots had been sold and Turkey Creek failed to repay the loan. The tortious conduct of the Director Defendants in connection with this transaction has resulted in damages of at least $1,562,394.

**Situs Preferred Locations, LLC**

44.     Pursuant to the recommendation of Martin and the approval of the Director

Defendants, on June 22, 2008, a $1,845,909 CRE development loan was extended to Situs

Preferred Locations, LLC ("Situs"). The repayment terms of the loan required 12 monthly

payments of interest with principal due at maturity on May 22, 2009. The Situs loan was secured

by a first mortgage on roughly 125 acres of property to be developed into a 263-lot, multi-phase

subdivision. The primary source of repayment was to come from sales of the residential lots and

the secondary repayment was the disposable income of the guarantors.

45.     The stated purpose of the loan was to "complete infrastructure and pay off

mortgages" which included a first mortgage of $400,000, as well as an outstanding $250,000

second mortgage held by WFNB as collateral for a November 2007 loan the Bank made to fund

infrastructure on the project. The RLL stated the loan was to be a non-revolving line of credit

that would be used to complete infrastructure and market the sale of the lake front lots. The

2008 loan proceeds were also to be used for reimbursement of expenses and a capital request as

outlined in a letter (attached to the RLL) from the managing partner, Borrower B (described

below). Borrower B's letter provided a breakdown of how the funds were to be used: $650,000

to repay the outstanding mortgages, $410,000 to "restore" the original investment of three

investors, $100,000 for "the next $1.5 million in sales," $425,000 for road construction on Phase

1A and $245,000 in discretionary funds.   The Director Defendants approved of reimbursing

only 50% of the investors' money ($205,000), but did not reduce the amount of the loan, thus

approving funding an additional $205,000 as discretionary funds.

46.     The actions of Martin and McDonald in originating and the Director Defendants

in approving the Situs loan were negligent, grossly negligent, breached their fiduciary duties, and

16

were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, the failure to undertake or require an accurate and adequate pre-approval analysis, failure to comply with the Board's underwriting standards for acceptable risk, and failure to comply with the prudent underwriting standards set forth in the Regulatory Guidelines and the Loan Policy.  Martin, McDonald and the Director Defendants knew that the structure of the loan – which repaid a substantial portion of the borrower's initial investment, gave the borrower total discretion regarding the use of over $500,000 in loan proceeds, and did not take into consideration the cost to develop enough lots to repay the loan – created an unacceptable risk.  This was particularly true given the primary source of repayment was based on the sale of lots at a time when the real estate market was declining.

47.    In addition to the Loan Policy's requirement that a sound credit analysis be done prior to approving the loan, the Loan Policy specifically required Martin and McDonald ensure the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions.  The Loan Policy also set forth specific underwriting standards to identify the level of risk acceptable to the Board, and required the approval of each real estate loan consider the borrower's capacity to service the debt, the overall credit worthiness of the borrower, the value of the mortgaged property, and all other relevant credit features.  The origination and approval of the Situs loan violated these Loan Policy requirements as evidenced by, among other things, the following:

a.    Martin, McDonald and the Director Defendants knew the loan failed to comply with the prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the information provided in the RLL was not sufficient to determine the adequacy of the borrower's capacity to service the debt or accurately assess the level of risk.

b.     Martin's tax return analysis prepared based on the guarantors' financial information was inaccurate and thus incorrectly assessed the borrowers' capacity to repay the loan.  Every form he completed contained inaccurate and/or incomplete information that was evident from the face of the tax returns, such as using adjusted gross income instead of gross wages, double counting business income, failing to include federal taxes shown on the return, and using data from only one tax year even though returns for two tax years were available.

c.     Martin and McDonald failed to analyze the personal financial statements of each of the guarantors resulting in the RLL's reporting incorrect or misleading information regarding the guarantors' net worth.  All of Borrower B's net worth was comprised of his 15% ownership in the Situs property which was the collateral for the loan; RJ's[3] net worth was overstated by 40% because his statement failed to include a large real estate mortgage as a liability; WL's net worth was overstated by 32% because his liabilities were not added correctly; 43% of FW's net worth was comprised of his interest in the Situs property which was collateral for the loan.

d.     Martin, McDonald and the Director Defendants knew or should have known that the personal financial statements of each of the guarantors showed their assets were illiquid.  From 92% to 70% of the guarantors' respective total assets were comprised of real estate holdings, which in some instances included their interest in the property serving as collateral for the loan.  There was no information provided upon which to determine liquidity for Situs.

e.     The RLL characterized Borrower B as an experienced, successful real estate developer but did not disclose his poor credit score and unsatisfactory payment history.

f.     Martin, McDonald and the Director Defendants knew the information provided was not sufficient to allow them to accurately calculate the LTV ratio as required by the Loan Policy and the Regulatory Guidelines.  The LTV ratio of 46.3% stated in the RLL was inaccurate.  The LTV ratio was based on an appraised value of $3.95 million for a completed 263 lot development which had projected total project costs of $6.8 million – far exceeding the $425,000 earmarked by the borrower for hard cost development activities.  Though the RLL does not state the number of

---

[3] Guarantors and others referenced herein by initials represent individuals whose names have been withheld to protect their privacy.  The names of these individuals will be provided once an appropriate protective order is in place.

saleable lots expected after the completion of the infrastructure to be funded by this loan, it was abundantly clear that it would not be 263 lots.

g.    Martin, McDonald and the Director Defendants knew the primary source of repayment – the sale of the completed lots – was grossly inadequate to repay the loan. The loan proceeds were going to be used, at most, to complete Phase 1A of the project, which according to the appraisal was comprised of 33 lots with a present gross value of $1,277,778.

h.    The pre-approval analysis of this loan was inadequate. Martin, McDonald and the Director Defendants knew there was no determination regarding the adequacy of the loan proceeds to complete the first phase of the project; there was no analysis of project cost estimates other than statements made in the appraisal, which were for the entire 263 lots; there was no analysis regarding the current real estate market conditions and demand even though, in his April 29, 2008 letter requesting the loan, Borrower B stated that "real estate is a little risky at this point with the economy and the mortgage crisis;" and there was no financial information or cash flow analysis for Situs.

i.    The information provided in the appraisal should have raised questions as to its reliability, such as using comparable sales that were almost 4 years old at the time of the appraisal and estimating a three year time for the sale of over 260 lots in a weakened real estate market.

j.    The Loan Policy required an equity contribution equal to 20% of the project cost or appraised value, but Martin, McDonald and the Director Defendants knew they did not have sufficient information to determine compliance with this provision because the RLL did not disclose the borrower's level of equity in the property as required by the Loan Policy and the Regulatory Guidelines, did not disclose the project costs, and included an incorrect appraisal value.

48.    The Director Defendants' approval of the Situs loan provided the borrower over $900,000 in a cash-out refinance of raw land at a time when the real estate market was deteriorating, even though the Director Defendants had no information as to the project costs required to complete enough lots to repay the loan. Six months after the loan was made, in November 2008, Situs requested the Bank lend it an additional $300,000 to cover operating expenses and "construction overages." Not even Phase 1A of the project was completed and the

19

value of the collateral fell significantly below the principal balance of the loan. The borrower failed to repay the loan. The tortious conduct of Martin, McDonald and the Director Defendants in connection with this transaction has resulted in damages of at least $558,650.

**Borrower B**

49.     Pursuant to the recommendation of Martin and the approval of the Director Defendants, on March 31, 2008, a $343,498 consumer real estate loan was extended to Borrower B and his wife, AJ ("Borrower B loan"). The stated purpose of the loan was to refinance the borrower's first mortgage with another lender. The repayment terms required 59 monthly payments of $2,109 and a balloon payment of $318,585 on April 3, 2013. The loan was secured by a first mortgage on residential property and the LTV ratio was stated as 76% based on a February 23, 2008 appraised value of $445,000. The RLL stated the primary source of repayment was "employment" and the secondary source was liquidation of assets.

50.     The actions of Martin and McDonald in originating, and the Director Defendants in approving the Borrower B loan were negligent, grossly negligent, breached their fiduciary duties, and were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, failure to comply with the Board's underwriting standards for acceptable risk for consumer and real estate loans, and failure to comply with the prudent underwriting standards set forth in the Regulatory Guidelines and the Loan Policy.

51.     In addition to the Loan Policy's requirement that a sound credit analysis be done prior to approving the loan, the Loan Policy specifically required Martin and McDonald ensure the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions. The Loan Policy also set forth specific underwriting

20

standards to identify the level of risk acceptable to the Board, and required the approval of each

real estate loan to consider the borrower's capacity to service the debt, the overall credit

worthiness of the borrower, the value of the mortgaged property, and all other relevant credit

features. The origination and approval of the Borrower B loan violated these Loan Policy

requirements as evidenced by, among other things, the following:

    a.      Martin, McDonald and the Director Defendants knew the loan failed to comply with prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the information provided in the RLL was not sufficient to determine the adequacy of the borrower's capacity to service the debt or accurately assess the level of risk.

    b.      Martin and McDonald knew the stated purpose of the loan was inaccurate, as the loan was to fund the purchase of the property and was not a refinance. The property was not deeded to AJ and Borrower B until April 1, 2008, the day after the closing. The appraisal – which was completed less than 40 days prior to the loan – stated there were no transfers within the past three years, although the RLL stated that Borrower B had purchased the property after November 2007. The appraisal did not identify Borrower B as the owner of public record; instead Borrower B was shown as the borrower with the word "contract" in parenthesis.

    c.      Although the RLL stated the loan was a refinance, the Director Defendants knew the amount of the first mortgage payoff was not provided.

    d.      The pre-approval analysis of this loan was inadequate. Martin, McDonald and the Director Defendants knew the RLL did not include key financial information, and the information that was included raised questions about the capacity of the borrowers to adequately service the debt.

    e.      The tax analysis prepared by Martin was inaccurate, causing him to incorrectly report average annual income as $79,000, overstating that amount by over $24,000. Martin's tax analysis incorrectly reported gross income as gross wages for 2005 and 2006. Martin incorrectly calculated disposable income by counting Borrower B's business income twice in the cash flow calculations. Even with Martin's overstatement of the cash flow, the borrowers' debt-to-income ("DTI") ratio was at the high end of the amount allowed under the Loan Policy at 41%, and was closer to 60% when calculated correctly. Thus the actual DTI ratio violated the Loan Policy requirement of a maximum DTI ratio of 45%.

f.      Without support, Martin and McDonald stated in the RLL that the DTI ratio will be substantially lower because Borrower B's income has increased to $93,000 and AJ will soon be taking a job paying $65,000 annually. The only document to support AJ's purported future salary was a letter from a law firm stating salary negotiations were at an advanced stage but provided no information about the amount of the salary being negotiated. There was no documentation to verify Borrower B's increased income; to the contrary, his November 6, 2007 personal financial statement reflected income of $72,000.

g.      Martin and McDonald also incorrectly reported the borrowers' net worth in the RLL, overstating it by $74,000. They reported net worth as $244,500; however, as both knew, the November 2007 personal financial statement was for Borrower B only, and reflected <u>total assets</u> of $244,500 and a net worth of $170,500. Moreover, of the $244,500 total assets, $225,000 or 92% were comprised of Borrower B's 15% ownership in real estate owned by Situs, a borrower which had pledged this property to the Bank (discussed above). The financial statement shows only $1,500 in cash on hand.

h.      As the Director Defendants knew, Martin stated the borrowers' net worth "does not reflect the $100,000 equity in their current home," i.e., the home actually being purchased with the proceeds of this loan, and thus in which they had no equity.

i.      The RLL indicated both borrowers had a poor credit history with low credit scores. Nonetheless, Martin and McDonald incorrectly stated in the RLL that Borrower B has "always performed according to contractual agreements." Borrower B's credit bureau reports showed a foreclosure as well as several delinquencies and charge-offs.

j.      Loan Policy underwriting guidelines required there be no delinquencies in the last 12 months and no charge-offs without adequate mitigants identified. Martin and McDonald failed to adequately identify mitigating factors.

k.      Martin and McDonald knew the credit reports demonstrated the November 2007 financial statement and DTI ratio calculations were not accurate as the reports showed over $80,000 in deferred student loan debt for AJ and Borrower B, and monthly payments of over $600 for two automobile loans to AJ that were not included in the DTI ratio calculation.

52.     The Borrower B loan also violated the Loan Policy requirement that the amount of a real estate loan should under no circumstances exceed 85% of the lower of the purchase price or the appraised value of the real estate.  Martin and McDonald stated in the RLL that the loan was a refinance of the borrowers' current loan with another lender, and the LTV ratio was stated as 76%.  In actuality, as Martin and McDonald knew, the loan was to purchase the property.  The closing statement reflected $314,000 of the loan went to purchase the property from the seller, thus, this loan provided over 100% financing for the purchase of the property.

53.     Payments began in May 2008 and six months later the loan was 30 days delinquent, and remained so until payments ceased in June 2009.  The tortious conduct of Martin, McDonald and the Director Defendants in connection with this transaction has resulted in damages of at least $271,433.

**Borrower C**

54.     Pursuant to the recommendation of Martin and McDonald and the approval of the Director Defendants, on July 9, 2008 a $1,378,149 commercial real estate loan was extended to Borrower C ("Borrower C loan").

55.     The purpose of the loan was to pay off a first mortgage on a commercial building and provide $350,000 to fund the borrower's cash equity requirements for the purchase of a chain hotel.  The collateral was the commercial building on a 7 acre tract – a former grocery store occupied by a furniture business owned by Borrower C through a wholly-owned corporation.  Borrower C was attempting to sell the building and land.  The RLL reported a value of $1.7 million based on an outside appraisal.  The terms of the loan were 12 monthly interest payments with principal due on July 9, 2009.  The RLL identified the primary source of

repayment as the net operating income ("NOI") of all of Borrower C's business entities. The secondary source of repayment was the refinancing of the hotel which Borrower C had not yet purchased.

56.     The actions of Martin and McDonald in originating, and the Director Defendants in approving the Borrower C loan were negligent, grossly negligent, breached their fiduciary duties, and were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, failure to undertake or require accurate and adequate pre-approval analysis, failure to comply with the Board's underwriting standards for acceptable risk for real estate loans, and failure to comply with the prudent underwriting standards set forth in the Regulatory Guidelines and the Loan Policy.

57.     In addition to the Loan Policy's requirement that a sound credit analysis be done prior to approving the loan, the Loan Policy specifically required Martin and McDonald ensure the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions. The Loan Policy also set forth specific underwriting standards to identify the level of risk acceptable to the Board, and required the approval of each real estate loan to consider the borrower's capacity to service the debt, the overall credit worthiness of the borrower, the value of the mortgaged property, and all other relevant credit features. The origination and approval of the Borrower C loan violated these Loan Policy requirements as evidenced by, among other things, the following:

> a.     Martin, McDonald and the Director Defendants knew the loan failed to comply with the prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the information provided in the RLL was not sufficient to determine the adequacy of the borrower's capacity to service the debt or accurately assess the level of risk.

24

b.  Martin, McDonald and the Director Defendants knew the information provided was not sufficient to allow them to accurately calculate the LTV ratio as required by the Loan Policy and the Regulatory Guidelines.

c.  Martin and McDonald knew the LTV ratio of 80% reported in the RLL was not accurate.  Martin and McDonald reported an appraised value of $1.7 million in the RLL; however, at the time the only appraisal in the file was dated April 11, 2008, less than two weeks before the RLL, and it reflected a value of $1.5 million resulting in an LTV ratio in excess of 90% in violation of both the Loan Policy and the Regulatory Guidelines

d.  Martin and McDonald knew, the cash flow and DTI ratio analyses were prepared based only on Borrower C's 2006 tax return and unsubstantiated 2008 "projected income" for a new strip shopping center, which projected income comprised 44% of the calculated net cash flow.  Martin's analysis contained inaccurate and incomplete information that was evident from the face of the tax return resulting in an incorrect assessment of Borrower C's ability to repay the debt and the risk associated with the loan.

e.  Martin and McDonald knew or should have known that the RLL inaccurately stated the property serving as collateral for the loan had a monthly rental income of $10,000 and would thus yield a positive cash flow of $3,000 after deducting the payment for the requested loan.  The property was rented by Borrower C's wholly-owned corporation which paid a total of $17,632 for rent in 2007 and paid $0 to date in 2008.

f.  Martin and McDonald knew Borrower C's February 5, 2008 personal financial statement relied on in connection with this loan was not analyzed or verified resulting in the RLL's reporting incorrect and misleading information regarding Borrower C's assets and net worth, including the following:

   i.   In the RLL Martin and McDonald reported that Borrower C had nearly $1 million in liquid assets; however, Borrower C's financial statement reflected over $600,000 of the $972,000 was in escrow in connection with real estate transactions and not available to service or repay the debt.

   ii.  Borrower C's February 5, 2008 personal financial statement reflected ownership of two pieces of land valued at $1.6 million with no associated debt; however, Borrower C had sold both properties in 2007, thus causing his net worth to be overstated by at least $1.6 million.

25

      iii.    Borrower C's February 5, 2008 personal financial statement
reflected ownership of two pieces of property in Savannah,
Georgia which the RLL described as two hotels and commercial
land. The financial statement reported no debt on these properties,
but Borrower C's tax return reflected both properties had
substantial debt associated with them.

58.      Borrower C made interest payments through October 2009, at which time all

payments ceased, and no principal payments were ever made on the loan. The tortious conduct

of Martin, McDonald and the Director Defendants in connection with this transaction has

resulted in damages of at least $800,000.

**Carolina Lodging, LLC**

59.      Pursuant to the recommendation of Odom and McDonald and the approval of the

Director Defendants, on May 22, 2008, a $1,252,549 five year commercial real estate loan was

extended to Carolina Lodging, LLC ("Carolina Lodging").

60.      The purpose of the loan was the purchase of a 98-unit hotel, which was to serve as

collateral for the loan. Carolina Lodging was a newly created limited liability company and the

guarantor/owners were JCP and HJP. The loan terms were 59 monthly payments of $9,753 with

a balloon payment of $1,076,560 on May 22, 2013. The hotel purchase price was $1,550,000,

and an outside appraisal valued the property at $1.6 million. The RLL stated repayment could

come from hotel income, additional hotel income (from an existing hotel owned by the

guarantors), home equity, or sale of the property

61.      The actions of Odom and McDonald in originating and the Director Defendants in

approving the Carolina Lodging loan were negligent, grossly negligent, breached their fiduciary

duties and were not consistent with prudent banking practices as evidenced by, among other

things, their violations of the Loan Policy, failure to undertake or require an adequate and

accurate pre-approval credit analysis, failure to comply with the Board's underwriting standards

for acceptable risk and failure to comply with the prudent underwriting standards set forth in the

Regulatory Guidelines and the Loan Policy.

62.    In addition to the Loan Policy's requirement that a sound credit analysis be done

prior to approving the loan, the Policy specifically required Odom and McDonald ensure the loan

recommendation was based on an accurate and thorough understanding of the customer's

financial needs and conditions.  The Loan Policy also set forth specific underwriting standards to

identify the level of acceptable risk to the Board and required the approval of each real estate

loan to consider the borrower's capacity to service the debt, the overall credit worthiness of the

borrower, the value of the mortgaged property, and all other relevant credit features.  The

origination and approval of the Carolina Lodging loan violated these Loan Policy requirements

as evidenced by, among other things, the following:

a.    McDonald, Odom and the Director Defendants knew the loan failed to
comply with prudent underwriting standards in the Regulatory Guidelines
and the Loan Policy as the information provided in the RLL was not
sufficient to determine the adequacy of the borrower's capacity to service
the debt or accurately assess the level of risk.

b.    McDonald and the Director Defendants knew or should have known from
the information presented that Odom's initial underwriting was inaccurate
and inadequate and reflected not only a lack of understanding of key
concepts for hotel/motel lending but also a failure to grasp even basic cash
flow analysis.

c.    Odom, McDonald and the Director Defendants knew or should have
known from the information presented that the guarantors' financial
statement reported $109,216 in liquidity which was inadequate to cover
the $310,000 down payment plus planned property upgrades of $100,000
indicated in the RLL.

d.    Odom's cash flow calculation for the guarantors was grossly overstated
and the debt service requirement was grossly understated because he
derived cash flow after adding back the depreciation and interest for the

27

guarantors' existing hotel operation but then calculated the DTI ratio using only personal debts.

e.    Odom, McDonald and the Director Defendants knew or should have known from the information presented that there was no adequate source of repayment for the loan as evidenced by the following:

i.    A September 30, 2007 balance sheet for the existing hotel owned by JCP and HJP showed a $14,000 line of credit and $37,400 current liability owed to another lender in addition to the $650,000 mortgage. It also showed a year to date operating loss and an overdrawn cash position. Thus, the stated secondary repayment source was not viable.

ii.    As was obvious from the RLL, Odom inaccurately computed projected net income for the hotel being acquired based on his incorrect conclusion that revenue per available room ("RevPAR") was the same as profit per room and the unsupported assumption the guarantors could increase the room rate by 22%.

iii.    Odom incorrectly concluded that the monthly income from the hotel being acquired was adequate to cover the monthly loan expense of the requested loan. Odom again incorrectly assumed that RevPAR was the same as profit. Odom did not obtain tax returns or financial statements from the previous owners. There is no historical expense data for the hotel's existing operation, or projected expenses from the borrower. Thus Odom, McDonald and the Director Defendants did not have sufficient information to determine monthly income.

iv.    Without any factual basis, Odom assumes this independent hotel's revenue per available room will be better than that provided in the Smith Travel Research STAR report for branded chain hotels, despite the fact this hotel has no interior entry and difficult ingress and egress.

63.    The Loan Policy restricted Odom's loan authority to those areas of lending where he was proficient and knowledgeable. As the Director Defendants knew from the RLL, this restriction was violated because neither Odom nor McDonald understood key concepts for hotel/motel lending.

64.     The loan payments became slow within 90 days of closing, and reached 30 days

delinquent by March 2009.  The tortious conduct of McDonald, Odom and the Director

Defendants in connection with this transaction has resulted in damages of at least $597,000.

**Borrower D**

65.     Pursuant to the recommendation of McDonald and Chandler and the approval of

Cherry, Hammond and Lee, on August 2, 2007, a $252,649 commercial real estate loan was

extended to Borrower D ("Borrower D loan").  The stated purpose of the loan was "to be used as

a revolving LOC [line of credit] for the purpose of investment properties."  The loan was secured

by Borrower D's primary residence which the RLL reflected at a value of $340,000 based only

on an in-house appraisal.  An undisclosed portion of the funds was to be used to pay off the

existing first mortgage on the property.  The loan was a 12-month single pay note with monthly

interest payments, and the noted primary source of repayment was rental income.

66.     The actions of McDonald and Chandler in originating and Cherry, Hammond, and

Lee in approving this loan were negligent, grossly negligent, breached their fiduciary duties and

were inconsistent with prudent banking practices because, as evidenced by, among other things,

their violations of the Loan Policy, violations of  banking regulations, failure to comply with the

Board's underwriting standards for acceptable risk and failure to comply with the prudent

underwriting standards set forth in the Regulatory Guidelines and the Loan Policy.

67.     In addition to the Loan Policy's requirement that a sound credit analysis be done

prior to approving the loan, the Loan Policy specifically required McDonald and Chandler ensure

the loan recommendation was based on an accurate and thorough understanding of the

customer's financial needs and conditions.  The Loan Policy also set forth specific underwriting

29

standards to identify the level of risk acceptable to the Board, and required the approval of each

real estate loan to consider the borrower's capacity to service the debt, the overall credit

worthiness of the borrower, the value of the mortgaged property, and all other relevant credit

features. The origination and approval of the Borrower D loan violated these Loan Policy

requirements as evidenced by, among other things, the following:

    a.    McDonald and the Director Defendants knew the loan failed to comply with the prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the RLL did not include key financial information needed to properly assess the risk, and the information included raised questions about the capacity of the borrower to adequately service the debt.

    b.    The Director Defendants knew the amount of the first mortgage payoff was not provided in the RLL, and there was no explanation as to how the remaining funds were to be used.

    c.    The Director Defendants knew or should have known McDonald inaccurately reported in the RLL that Borrower D "has always handled her accounts as agreed." The RLL reflected that Borrower D already had a loan with the Bank which was a $15,000, 36-month installment loan made by McDonald in May 2006. At the time of the RLL (June 28, 2007) the Bank had already experienced several instances of delinquency with this obligation. A May 2006 credit report disclosed collection accounts and a history of major delinquency issues. A new credit bureau report dated June 28, 2007 showed performance issues with every credit obligation disclosed. Borrower D's 2007 credit score fell 48 points from an already undesirable low in 2006.

    d.    McDonald and the Director Defendants knew or should have known that the pre-approval analysis for this loan was inadequate. McDonald's DTI ratio calculation of 45% – the maximum allowed by the Loan Policy – was inaccurate. This calculation was based on gross revenue of $11,192 from 31 mobile homes plus $1,788 in unspecified, unverified other income, although the loan application required the source to be described. The mobile home revenue was based on 95% occupancy without making any allowance for the cost of ownership, such as taxes, insurance and maintenance. If calculated properly, Borrower D's DTI ratio exceeded the maximum 45% ratio in violation of the Loan Policy.

    e.    McDonald and the Director Defendants knew or should have known that there was no cash flow analysis, no tax returns were provided, and Borrower

D's statements of net worth showed illiquid assets were 81% of her total net worth. Without explanation, Borrower D's 2007 net worth was shown as more than triple her 2006 net worth, rising from $324,000 to $1.085 million in the year since her May 2006 loan.

68.     McDonald's RLL stated the loan was a commercial line of credit. McDonald and the Director Defendants knew the Loan Policy only permitted commercial lines of credit to be extended to business customers to meet their short-term financing needs and required built in rest periods (complete payment of the line) during the year.

69.     The Loan Policy and banking regulations required an appraisal of collateral by a state certified or licensed appraiser on real estate transactions above $250,000. McDonald and the Director Defendants knew the Borrower D loan violated both as the loan was in excess of $250,000, and the value of the collateral was supported only by an in house appraisal. Even the in house appraisal violated the Bank's Real Estate Appraisal Policy which required such evaluation be prepared by two officers or directors not connected with the loan under consideration, and who were experienced in real estate appraising. One of the officers signing the evaluation was Odom, who was not experienced in real estate appraising and who served as the loan processor for McDonald on the loan. The value assigned to the collateral was the purported listing price.

70.     The loan showed its first signs of delinquency in February 2008, six months after closing, after which payment was received on only two occasions. The Bank instituted foreclosure proceedings in September 2008, and ultimately foreclosed on and sold the property in 2009 for net proceeds of $154,874.99. The tortious conduct of McDonald and the Director Defendants in connection with this transaction has resulted in damages of at least $94,038.

31

**Global Works, LLC**

### Overview

71.     In a seven-month period beginning in June 2007, McDonald originated and WFNB funded nine loans totaling more than $1.9 million to Global Works, LLC ("Global"). Three loans were closed in a 10 day period, and another four in a 39 day period.

72.     A July 23, 2008 internal assessment of the Global relationship determined: "File underwriting at origination relied consistently on financial information of limited quality/detail and reported global personal [cash flow] that was never supported by any file calculations. Personal [net worth] appears to have been overstated. No liquidity was ever noted." The assessment also concluded that providing $245,000 cash to Global in refinancing transactions in the prior 10 months (enough to service all relationship debt for more than a year) combined with the performance history and delinquency status indicated that cash flow was substantially negative, and there was insufficient information in the file to even estimate the size of the shortfall.

### Global Loan #1

73.     Pursuant to the recommendation of McDonald the approval of the Director Defendants, on September 24, 2007, a $109,149 three-year commercial real estate loan was extended to Global ("Global loan #1"). According to the RLL, Global was a limited liability company set up to handle the investment properties of guarantor/owner, RM, which mainly consisted of a 115 acre development. The repayment terms required 35 monthly payments of $1,036.22 and one balloon payment of $102,633.19 on September 24, 2010. The loan was secured by a first mortgage on residential property. The RLL noted the primary source of

repayment was $750 in rental income from the property. The secondary repayment source was business income or liquidation of the collateral.

74.     The stated purpose of the loan was to refinance the existing real estate debt held by a mortgage company. The reason given for the refinance was to lower the borrower's loan rate and place the loan on monthly payments. Including this loan request, the total outstanding commitments to Global and RM were over $1.2 million.

75.     The actions of McDonald and Chandler in originating and the Director Defendants in approving Global loan #1 were negligent, grossly negligent, breached their fiduciary duties and were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, violation of federal banking law, failure to undertake or require sufficient and accurate pre-approval credit analysis, failure to comply with the Board's underwriting standards for acceptable risk, and failure to comply with the prudent underwriting standards set forth in the Regulatory Guidelines and the Loan Policy.

76.     In addition to the Loan Policy's requirement that a sound credit analysis be done prior to making the loan, the Loan Policy specifically required McDonald and Chandler ensure the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions. The Loan Policy also set forth specific underwriting standards to identify the level of risk acceptable to the Board, and required the approval of each real estate loan to consider the borrower's capacity to service the debt, the overall credit worthiness of the borrower, the value of the mortgaged property, and all other relevant credit features. The origination and approval of the Global loan #1 violated these Loan Policy requirements as evidenced by, among other things, the following:

a.  McDonald and the Director Defendants knew the loan failed to comply with the prudent underwriting standards in the Regulatory Guidelines and the Loan Policy.  The RLL did not include key financial information needed to properly assess the risk, and the supporting documentation was grossly inadequate.

b.  McDonald and the Director Defendants knew the pre-approval analysis of this loan was inadequate.  The amount of the first mortgage payoff was not included, and there was no information about how the remaining funds were to be used; no cash flow analysis was provided; and RM's July 2006 credit report reflected that he was a poor credit risk with a very low credit and that he had filed bankruptcy twice.

c.  McDonald and the Director Defendants knew the primary source of repayment was inadequate.  There were no cash flow projections or supporting documentation for the rental income reported by the borrower or the guarantor, and the reported monthly rental income of $750 was not adequate to cover the monthly payments for this loan.

d.  McDonald and the Director Defendants knew or should have known the secondary source of repayment was not adequate.  The RLL overstated the adjusted gross income reported in RM's 2005 and 2006 tax returns; Global's financial statement showed illiquid assets represented 99% of its total net worth, and cash on hand was only $4,000; and RM's financial statement showed illiquid assets represented 92% of his total net worth, and cash on hand was only $27,000.

e.  McDonald and Chandler knew or should have known that an incorrect appraisal value was used in the RLL because the value was subject to the completion of significant repairs and none of the loan proceeds were for the purpose of making those repairs.  An "as is" appraisal value should have been used.

f.  The stated purpose of the loan was inaccurate.  At closing, the proceeds were split between Global and JP and were not disbursed directly to the mortgage company or any other lender as would be required if the loan were a refinance.

77.  The Loan Policy also provided the amount of a real estate loan should under no circumstances exceed 85% of the lower of the purchase price or the appraised value of the real estate.  McDonald and the Director Defendants knew the approval of this loan violated this

policy. The RLL stated the LTV ratio was 80% based on an August 27, 2007 appraisal valuing the property at $135,000 subject to completion of renovations. The appraisal showed a mortgage company as the owner, and stated the property had sold on June 25, 2007, for only $67,184. In fact, JP purchased the property from the mortgage company for $45,000 on August 27, 2007, and quitclaimed the property to Global on September 21, 2007, two days after the loan was approved and just three days before the loan closed. The quitclaim was accompanied by an affidavit of RM stating the fair market value of the property was only $53,000. Indeed, at closing, $52,860 of the loan proceeds were distributed to JP for the purchase of this property. Thus, the approval of this loan violated the Loan Policy because the loan provided well over 100% financing for the purchase of the property, netting Global $52,585 after payment of the closing costs.

78.     Federal banking regulations require an appropriate evaluation of real property collateral that is consistent with safe and sound banking practices be obtained, and the Loan Policy required an independent appraisal that followed a reasonable valuation method. The approval of this loan using the August 27, 2007 appraisal violated these provisions because (a) as an evaluation of an income-producing property for a loan whose source of repayment was the rental income, the appraisal did not describe the current and expected use of the property or include an analysis of the property's rental income and expenses; and (b) as support for a loan whose purpose was to refinance the property without any proceeds going to make repairs, the appraisal did not provide an "as is" value.

79.     There were only seven payments made from inception of the loan to May 2008. The Bank foreclosed on the property and subsequently sold it on December 2, 2009 for $24,938.

35

The tortious conduct of McDonald and the Director Defendants in connection with this transaction has resulted in damages of at least $86,198.

**Global Loan #2**

80.    Pursuant to the recommendation of McDonald and the approval of the Director Defendants, on November 8, 2007, a $574,749 commercial real estate loan was extended to Global ("Global loan #2). The RLL stated the purpose of the loan was to refinance an existing debt on commercial real estate financed with another bank and to obtain funds "for business investments (purchase real estate properties)." No further explanation was provided as to the use of the funds. Including this request, the total outstanding commitments to Global and RM were over $1.8 million.

81.    The repayment terms required 35 monthly payments of $4,910.24 and a balloon payment of $562,499.74 on November 8, 2010. The loan was secured by a first mortgage on an office building. The primary source of repayment was rental income from the property, and the secondary repayment source was business income or from liquidation of the collateral.

82.    The actions of McDonald and Chandler in originating, and the Director Defendants in approving Global loan #2 were negligent, grossly negligent, breached their fiduciary duties, as evidenced by, among other things, their violations of the Loan Policy, failure to undertake or require an adequate and accurate pre-approval credit analysis, and failure to comply with the Board's underwriting standards for acceptable risk and failure to comply with the prudent underwriting standards set forth in the Regulatory Guidelines and the Loan Policy

83.    In addition to the Loan Policy's requirement that a sound credit analysis be done prior to making the loan, the Loan Policy specifically required McDonald and Chandler ensure

the loan recommendation was based on an accurate and thorough understanding of the

customer's financial needs and conditions.  The Loan Policy also set forth specific underwriting

standards to identify the level of risk acceptable to the Board, and required the approval of each

real estate loan to consider the borrower's capacity to service the debt, the overall credit

worthiness of the borrower, the value of the mortgaged property, and all other relevant credit

features.  The origination and approval of the Global loan #2 violated these Loan Policy

requirements because, among other reasons, the RLL for Global loan #2 recited the same

financial information and the loan contained the same omissions, inadequacies, and violations as

Global loan #1 described in Paragraph 76 (a)-(d) above.  Additionally, the origination and

approval of this loan violated these requirements because of the following:

a.      Though McDonald characterized the loan as a refinancing of a Global loan
        at another bank, in fact the loan proceeds paid off a mortgage at a third
        bank in the name of RM and SP.

b.      The RLL did not disclose that RM was the owner of a one-half interest in
        the collateral property with the other half owned by his business partner
        SP.  The appraisal reflected the joint ownership and indicated SP's intent
        to transfer his ownership to RM.  The day before the loan was made, RM
        purchased SP's interest in the property for $50,000 and at the closing
        Global received cash of $98,941.

c.      Instead of a refinance, the loan proceeds were actually used by Global to
        purchase the property by assuming the debt of $462,870.58 and funding
        the $50,000 payment to SP.

84.     The Loan Policy also provided the amount of a real estate loan should under no

circumstances exceed 85% of the lower of the purchase price or the appraised value of the real

estate.  The origination and approval of this loan violated this Loan Policy requirement because

Global purchased the property for $512,871 with the loan proceeds, thus the loan amount

exceeded 100% of the purchase price.

85.    Global made only 5 monthly payments on this loan, and the Bank foreclosed on the property in November 2009. The tortious conduct of McDonald and the Director Defendants in connection with this transaction has resulted in damages of at least $577,891.

**Global Loan #3**

86.    Pursuant to the recommendation of McDonald and the approval of Chandler, Hammond, and Lee, on January 14, 2008, a $300,744 commercial real estate loan in the form of a line of credit was extended to Global ("Global loan #3"). The stated purpose of the loan was to set up a revolving line of credit for the borrower to have "funds available for business investments." The RLL provided no further explanation as to how the funds were to be used. Including this loan request, total outstanding commitments to Global and RM were in excess of $2 million.

87.    The loan was secured by a first mortgage on three parcels of land, two in Florence and one in Hartsville, South Carolina. The repayment terms required 12 monthly paym3ents of interest only with the principal due at maturity.   The RLL stated the primary source of repayment was sale of the collateral, but the credit narrative stated repayment would come from business income generated through rental and liquidation of investment properties.

88.    The actions of McDonald and Chandler in originating, and Chandler, Hammond, and Lee in approving the Global loan #3 were negligent, grossly negligent, breached their fiduciary duties, were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, failure to undertake or require an adequate and accurate pre-approval credit analysis, failure to comply with the Board's underwriting standards

38

for acceptable risk and failure to comply with the prudent underwriting standards set forth in the Regulatory Guidelines and the Loan Policy.

89.    In addition to the Loan Policy's requirement that a sound credit analysis be done prior to making the loan, the Loan Policy specifically required McDonald and Chandler ensure the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions. The Loan Policy also set forth specific underwriting standards to identify the level of risk acceptable to the Board, and required the approval of each real estate loan to consider the borrower's capacity to service the debt, the overall credit worthiness of the borrower, the value of the mortgaged property, and all other relevant credit features. The origination and approval of the Global loan #3 violated these Loan Policy requirements as evidenced by, among other things, the following:

a.    The RLL for Global loan #3 recited the same financial information and the loan contained the same omissions, inadequacies, and violations as Global Loan #1 described in Paragraph 76 (a)-(d) above.

b.    The Loan Policy only permitted commercial lines of credit to be extended to business customers to meet their short-term financing needs and required built in rest periods (complete payment of the line) during the year. McDonald, Chandler, Hammond and Lee knew the loan's purpose was not for short-term financing and required no rest periods.

c.    McDonald, Chandler, Hammond and Lee knew or should have known that the RLL reported Global's total commitments as $1.684 million when the total borrowings were $2.057 million.

d.    McDonald, Chandler, Hammond and Lee knew or should have known that the RLL reported that RM had handled all of his accounts with the Bank as agreed, when in fact five of the eight loans outstanding to the borrower at the time of this loan request had one or more late payments.

90.     The borrower made only four payments on this loan totaling $12,301.  The

tortious conduct of McDonald and the Director Defendants in connection with this transaction

has resulted in damages of at least $138,000.

**Borrower E and DAR Realty**

91.     The series of loans to Borrower E, a residential real estate developer and real

estate agent, and his company, DAR Realty, Inc. ("DAR Realty"), further demonstrate the

Defendant Directors' tortious conduct.  As a result of Borrower E's initial success in repaying a

subdivision development loan initially advanced in 2005 and his position on the Bank's advisory

board to the Florence branch, the Defendant Directors continued to make loans to him in a

declining real estate market without independently evaluating his financial position at the time of

each loan.  During the course of the relationship, the Defendant Directors failed to recognize the

warning signs of increasing credit risk such as loans to Borrower E for general business

expenses, the payment of property taxes, and to refinance credit card debt.  The reliance on past

success without thorough analysis and understanding of the borrower's financial condition was

instrumental in the damages sustained in connection with this borrower.

**Borrower E Loan #1**

92.     Pursuant to the recommendation of McDonald and the approval of the Defendant

Directors, on December 19, 2007, a $30,098 unsecured commercial loan was extended to

Borrower E ("Borrower E loan #1").  The terms of the loan were six months single pay, meaning

the borrower had no payments until the loan was due.  The primary source of repayment was the

sale of a home in a residential subdivision development the Bank had previously financed for

40

Borrower E. Additional repayment sources identified were Borrower E's income, additional real estate equities, his restaurant, or retirement funds.

93.    The stated purpose of the loan was to finalize business expenses in connection with the subdivision. At the time of the loan, Borrower E's outstanding commitments, including this loan, totaled $411,464, of which $33,500 was unsecured. The RLL stated there were 26 lots remaining in the subdivision valued at $676,000, and that Borrower E should pay out all debts related to the project within six months.

94.    The actions of McDonald and Chandler in originating and the Director Defendants in approving Borrower E loan #1 were negligent, grossly negligent, breached their fiduciary duties and were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, and failure to undertake or require adequate pre-approval credit analysis.

95.    In addition to the Loan Policy's requirement that a sound credit analysis be done prior to approving the loan, the Loan Policy specifically required McDonald and Chandler ensure the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions. The Loan Policy also set forth specific underwriting standards to identify the level of risk acceptable to the Board, and required the approval of each real estate loan to consider the borrower's capacity to service the debt, the overall credit worthiness of the borrower, the value of the mortgaged property, and all other relevant credit features. The origination and approval of the Borrower E loan #1 violated these Loan Policy requirements as evidenced by, among other things, the following:

    a.    McDonald and the Director Defendants knew the loan failed to comply with the prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the RLL did not include key financial information

41

needed to properly assess the risk, and raised questions about the reliability of the information presented.

b.    McDonald and the Director Defendants knew the cash flow and DTI information presented was based on McDonald's analysis of Borrower E's 2005 tax returns for a loan he was requesting in December 2007. The RLL indicated the financial information for DAR Realty was also based on 2005 tax returns.

c.    McDonald knew that Borrower E's financial statement was undated, but the net worth information provided was based on Borrower E's December 4, 2006, financial statement, thus violating the Loan Policy requirement that financial statements be less than 12 months old.

d.    McDonald and the Director Defendants did not have sufficient information to assess the borrower's repayment capacity because there was no current financial information on Borrower E or DAR Realty, no information regarding debt service requirements for DAR Realty, and no global cash flow analysis.

e.    McDonald and the Director Defendants knew or should have known that the RLL inaccurately reported or selectively reported the available financial information. The RLL did not report that 74% of Borrower E's total assets were illiquid, with 55% of total assets in real estate holdings. The RLL also did not report information from DAR Realty's 2005 tax return showing it was highly leveraged with 95% of its total assets being illiquid – including almost 70% in real estate holdings and about a quarter of its assets comprised of a $578,000 boat – and that it had less than $5,000 in cash. The RLL also failed to disclose that DAR Realty's tax return reflected losses in 2004 and 2005.

f.    McDonald's assessment of the borrower's capacity to repay the loan was inaccurate. The tax return analysis used by McDonald contained incomplete and inaccurate information. McDonald's analysis used income from the corporation as individual income, thereby tripling Borrower E's net cash flow; reflecting a DTI ratio of 43% when it was actually 131%; and showing disposable income of $14,788 when in fact it was a negative $2,698.

96.    At maturity, the Borrower E loan #1 was renewed with repayment terms requiring six months of interest only payments and principal due at maturity. At the time of renewal, the RLL stated there were only 12 lots remaining to be sold, but gave no explanation as to why no

proceeds from any of the 14 prior lot sales had been applied to payment of Borrower E loan #1 even though the sale of lots had been identified as the primary source of repayment. When the loan came due again six months later, it was consolidated with DAR Realty loan #1 (discussed below) into a new note secured by a third mortgage on 22 acres of land, and renewed with repayment terms of 11 monthly payments and one balloon payment at maturity. The tortious conduct of McDonald and the Director Defendants in connection with this transaction has resulted in damages of at least $29,920.

### DAR Realty Loan #1

97.     Pursuant to the recommendation of McDonald and the approval of the Director Defendants, on February 25, 2008, a $20,098 unsecured commercial loan was extended to DAR Realty ("DAR Realty loan #1"). The terms were 90 days single pay, thus the borrower had no payment requirements until the note was due. The source of repayment, as with Borrower E loan #1, was to be from the sale of lots in Borrower E's existing subdivision. The RLL provided additional repayment could come from additional real estate equity, Borrower E's income, stock sales, or cash value in his life insurance policy.

98.     The stated purpose of the loan was for business expenses associated with Borrower E's beginning another subdivision development. At the time of the loan, Borrower E's outstanding commitments, including this loan, totaled $456,682, of which $63,500 was unsecured.

99.     The actions of McDonald and Chandler in originating and the Director Defendants in approving DAR Realty loan #1 were negligent, grossly negligent, breached their fiduciary duties, and were not consistent with prudent banking practices as evidenced by, among

other things, their violations of the Loan Policy and failure to undertake or require an adequate
pre-approval credit analysis.

100.    In addition to the Loan Policy's requirement that a sound credit analysis be done
prior to approving the loan, the Loan Policy specifically required McDonald and Chandler ensure
the loan recommendation was based on an accurate and thorough understanding of the
customer's financial needs and conditions. The Loan Policy also set forth specific underwriting
standards to identify the level of risk acceptable to the Board, and required the approval of each
real estate loan to consider the borrower's capacity to service the debt, the overall credit
worthiness of the borrower, the value of the mortgaged property, and all other relevant credit
features. The origination and approval of DAR Realty loan #1 violated these Loan Policy
requirements as evidenced by, among other things, the following:

a.    McDonald and the Director Defendants knew the loan failed to comply
with the prudent underwriting standards in the Regulatory Guidelines and
the Loan Policy as the RLL did not include key financial information
needed to properly assess the risk, and raised questions about the
reliability of the information presented.

b.    McDonald and the Director Defendants knew there was no analysis or
discussion regarding the status of the new development or exactly how the
funds would be used.

c.    McDonald and the Director Defendants knew they did not have sufficient
information to assess the borrower's repayment capacity because there
was no current financial information on Borrower E or DAR Realty, no
information regarding debt service requirements for DAR Realty, and no
global cash flow analysis.

d.    McDonald and the Director Defendants knew or should have known the
asset, liability and net worth information contained in the RLL and the
January 2008 financial statement for Borrower E were unreliable because
they contained exactly the same information – including cash balances,
amount of liabilities, and value of real estate – as provided in Borrower
E's December 4, 2006, financial statement.

44

e.    McDonald and the Director Defendants knew or should have known the RLL inaccurately reported or selectively reported the available financial information. The RLL did not report that 74% of Borrower E's assets were illiquid with 55% of assets in real estate holdings. The RLL also did not report information from the 2006 return showing that DAR Realty was highly leveraged with almost 95% of its assets being illiquid − including 70% in real estate holdings and almost a quarter of its assets comprised of a $578,000 boat − and a cash balance of only $201. The RLL also failed to disclose that DAR Realty's tax return showed losses for 2004 and 2005.

f.    McDonald's RLL touted his tax return analysis for Borrower E to support this loan. The tax return analysis used by McDonald contained incomplete and inaccurate information. McDonald's analysis used income from the corporation as individual income, thereby tripling Borrower E's net cash flow; reflecting a DTI ratio of 43% when it was actually 131%; and showing disposable income of $14,788 when in fact it was a negative $2,698.

g.    Borrower E's credit, which McDonald had praised as "impeccable" in the RLL two months earlier, was described as "established". McDonald did not obtain an updated credit report and the RLL did not disclose information from Borrower E's credit report as of December 8, 2006, which reflected a low credit score.

101.    The Director Defendants approved the renewal of DAR Realty loan #1 in July 2008 (at the same time they renewed Borrower E loan #1) with repayment terms requiring six months of interest only payments and principal due at maturity. The RLL for the renewal stated there were only 12 lots remaining to be sold, but gave no explanation as to why no proceeds from any of the 14 prior lot sales had been applied to payment of DAR Realty loan #1 even though the sale of lots had been identified as the primary source of repayment. In May 2009, the loan was renewed and consolidated with Borrower E loan #1 into a new note to Borrower E secured by a third mortgage on 22 acres of land, with repayment terms of 11 monthly payments and one balloon payment at maturity. After only one payment Borrower E defaulted on the new

note. The tortious conduct of McDonald and the Director Defendants in connection with this transaction has resulted in damages of at least $20,197.

**DAR Realty Loan #2**

102.    Pursuant to the recommendation of McDonald and the approval of the Director Defendants, on April 1, 2008, a $433,163 commercial real estate construction loan was extended to DAR Realty in the form of a 12 month draw down line of credit ("DAR Realty loan #2"). The Director Defendants approved the DAR Realty loans #1 and #2 at the same Loan Committee meeting.

103.    The repayment terms were 11 monthly payments of interest, with principal due at maturity. The stated purpose of the loan was to construct a duplex townhouse in Borrower E's new gated community, the development of which was being financed by another lender. The loan was secured by a first mortgage on the townhouses which the RLL stated appraised for $576,000 each, resulting in a 75% LTV ratio. The townhouses actually appraised for $17,000 less and were subject to completion.

104.    At the time of the loan Borrower E's outstanding commitments, including this loan, totaled $888,582. The primary source of repayment was stated as lease income. Additional sources of repayment were the sale of the townhouses, sale of additional real estate, or Borrower E's personal income as a realtor. According to the RLL, the borrower would pay interest monthly while the duplex was under construction and then lease the unit to pay the permanent mortgage. The Director Defendants' approval was conditioned on the borrower's injecting a minimum of 10% cash and/or real estate equity into the project based on the construction contract price.

46

105. The actions of McDonald and Chandler in originating and the Director Defendants in approving DAR Realty loan #2 were negligent, grossly negligent, breached their fiduciary duties and were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy and the failure to undertake or require an adequate pre-approval credit analysis.

106. In addition to the Loan Policy's requirement that a sound credit analysis be done prior to approving the loan, the Loan Policy specifically required McDonald and Chandler ensure the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions. The Loan Policy also set forth specific underwriting standards to identify the level of risk acceptable to the Board, and required the approval of each real estate loan to consider the borrower's capacity to service the debt, the overall credit worthiness of the borrower, the value of the mortgaged property, and all other relevant credit features. The origination and approval of the DAR Realty loan #2 violated these Loan Policy requirements as evidenced by, among other things, the following:

a. McDonald and the Director Defendants knew the loan failed to comply with the prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the RLL did not include key financial information needed to properly assess the risk, and raised questions about the reliability of the information presented.

b. The pre-approval analysis of the loan was inadequate. McDonald and the Director Defendants knew the information presented reflected the borrower had 17 acres to develop with 13 lots ready to sell, but provided no analysis or additional information regarding the status of the development. There were no cost estimates to determine the accuracy or sufficiency of the funds allocated for construction, and the appraisal report did not include cost estimates.

c. The RLL for DAR Realty loan #2 recited the same financial information and the loan underwriting contained the same omissions, inadequacies,

47

and violations as DAR Realty loan #1 described in Paragraph 100 (c)-(g) above.

d.      The Director Defendants' loan approval stipulated the borrower inject a minimum of 10% cash and/or real estate into the project based on the construction contract price, which violated the Loan Policy because it waived the requirement for a 20% equity contribution without identifying adequate mitigating factors.

107.    DAR Realty loan #2 was renewed on April 16, 2009, with repayment terms requiring six months of interest only payments and with principal and interest due at maturity. Only one payment was made after the last advance in June 2009. The tortious conduct of McDonald and the Director Defendants in connection with this transaction has resulted in damages of at least $327,500.

**Borrower A**

108.    Pursuant to the recommendation of McDonald and the approval of Chandler, Cherry and Lee, on September 7, 2007, a $130,748 commercial real estate loan was extended to Borrower A ("Borrower A loan"). The RLL stated the purpose of the loan was to refinance existing investment property owned by the borrower and was to be secured by a first mortgage on that property. The terms required 35 monthly payments and a balloon payment on September 7, 2010. The primary source of repayment was the lease/purchase of the property with the secondary repayment source being liquidation of the collateral and other business income. The amount of debt outstanding to Borrower A including this request was $276,000.

109.    The actions of McDonald and Chandler in originating and Chandler, Cherry, and Lee in approving the Borrower A loan were negligent, grossly negligent, breached their fiduciary duties and were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, violation of federal banking law, failure to undertake

48

or require an adequate pre-approval credit analysis, failure to comply with the Board's underwriting standards for acceptable risk and failure to comply with the prudent underwriting standards set forth in the Regulatory Guidelines and the Loan Policy.

110.    In addition to the Loan Policy's requirement that a sound credit analysis be done prior to approving the loan, the Loan Policy specifically required that McDonald and Chandler ensure the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions.  The Loan Policy also set forth specific underwriting standards to identify the level of risk acceptable to the Board, and required the approval of each real estate loan to consider the borrower's capacity to service the debt, the overall credit worthiness of the borrower, the value of the mortgaged property, and all other relevant credit features.  The origination and approval of the Borrower A loan violated these Loan Policy requirements as evidenced by, among other things, the following.

    a.    McDonald, Chandler, Cherry and Lee knew the loan failed to comply with the prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the RLL did not include key financial information needed to properly assess the risk, and the supporting documentation was inadequate.

    b.    McDonald, Chandler, Cherry and Lee knew the pre-approval analysis was inadequate.  There were no tax returns for Borrower A, no cash flow analysis and no cash flow projections or supporting documentation for the rental income and associated expenses.

    c.    McDonald, Chandler, Cherry and Lee knew or should have known that the financial information presented in the RLL was significantly different than the information that had been reported five months earlier in connection with another WFNB loan and contained numerous inaccuracies, some of which were evident from the face of the loan application.

        i.    The borrower's stated monthly income was unverified and had increased to over $15,000 from the $9,000 (also unverified) that had been reported five months earlier.

49

      ii.     The borrower's net worth of $71,000 as reported in March 2007 –
which McDonald had described as limited five months earlier – had
increased to $471,686.

d. McDonald, Chandler, Cherry and Lee knew or should have known that the
sources of repayment from the loan were inadequate. The reported monthly
net rental income of $5,800 included $2,400 that had been estimated based
on the sale of one lot for $30,000.

e. McDonald and Chandler knew or should have known that the 37% DTI
ratio reported in the RLL was grossly understated because the borrower's
reported monthly debt did not include payments on another WFNB loan that
was approved for refinancing on the same date as this loan; it was calculated
using gross rental income without any provision for insurance, maintenance,
and taxes; and included as monthly income an "estimated" sale of one lot. It
also did not account for other debts which were shown on Borrower A's
credit report, but not on her financial statement. Borrower A's DTI ratio
calculated using only the debt on her financial statement and the loan
payments for the two new loans and unverified monthly income without the
"estimated" lot sale was 55%. Even including the "estimated" lot sale as
monthly income Borrower A's DTI ratio was 46%, in violation of the Loan
Policy maximum DTI ratio of 45%.

f. McDonald, Chandler, Cherry and Lee knew or should have known that
illiquid assets comprised 99% of Borrower A's total assets, with real estate
holdings comprising 94% of her total assets.

g. McDonald, Chandler, Cherry and Lee knew that the stated purpose of the
loan was inaccurate. The purpose of the loan was to finance the purchase of
the property, not to refinance property Borrower A already owned.

111. McDonald, Chandler, Cherry and Lee knew their approval of this loan violated

both the Regulatory Guidelines and the Loan Policy. The Regulatory Guidelines and the Loan

Policy provided commercial real estate loans secured by 1 to 4 family residential property that

is not owner occupied could not exceed a LTV ratio of 85%. The Loan Policy also provided the

amount of a real estate loan should under no circumstances exceed 85% of the lower of the

purchase price or the appraised value of the real estate. The RLL reported the LTV ratio as 80%

based on an August 1, 2007 "as is" appraised value of $162,000. The RLL indicated the

purpose of the loan was to refinance property Borrower A already owned. In fact, the property was quitclaimed to Borrower A for $5.00 on August 30, 2007, a week before the closing. The affidavit accompanying the quitclaim deed, which was executed by the closing attorney, indicated the fair market value of the property was $129,600. Thus, the approval of this loan violated these provisions of the Loan Policy because the loan provided 100% financing for the purchase of the property.

112.     Federal banking regulations require an appropriate evaluation of real property collateral that is consistent with safe and sound banking practices be obtained and the Loan Policy required an independent appraisal that followed a reasonable valuation method. Approval of this loan based on the August 1, 2007 appraisal violated these provisions because, as an evaluation of an income-producing property for a loan whose source of repayment was the rental income, the appraisal did not describe the current and expected use of the property or include an analysis of the property's rental income and expenses.

113.     The August 1, 2007, appraisal was completed for a mortgage company (a company owned by WFNB borrower and guarantor JM (described below), and contained inaccuracies such as incorrectly stating the distance of comparables from the subject property, and identifying Borrower A as the owner of public record. The value assigned in the appraisal was 25% higher than the market value stated in the affidavit accompanying the quitclaim transaction just thirty days later. There was no appraisal review or other documentation the appraisal was found to be acceptable as required by the Bank's Appraisal Policy.

114.     Only seven payments were made on the Borrower A loan with the last one received in May 2008, and all of the payments were late. In December 2009, the Bank accepted

51

a deed in lieu of foreclosure and confession of judgment from Borrower A. The tortious conduct of the McDonald, Chandler, Cherry and Lee in connection with this transaction has resulted in damages of at least $119,486.

**Security Builders and Associates, Inc.**

115.    Pursuant to the recommendation of McDonald and the approval of the Director Defendants, on November 14, 2007, a $534,600 CRE loan was extended to Security Builders and Associates, Inc. ("SBA") ("SBA loan").

116.    SBA was owned and operated by guarantor JM, a residential contractor/developer specializing in custom built homes and homes built based on speculation that a buyer will come along and purchase the home at or near completion ("spec homes"). The RLL stated the purpose of the loan was for the purchase of investment real estate and construction. $143,000 was for the purchase of commercial property which was to be operated as a full service garage and $136,250 was for construction of a duplex on property already owned by JM. The remaining funds were to be used for the construction of a second duplex on property already owned by JM and remodeling of a third duplex. The loan was made in the form of a draw down line of credit, and terms required 11 monthly payments of interest only with the principal due on November 14, 2008. According to the RLL, the primary source of repayment was to be the refinance of the loan into a long term mortgage, and the secondary source of repayment was liquidation of assets. The loan was to be secured by a first mortgage on the three duplexes, the commercial garage, and on a residential rental home, which purportedly was added to provide a 75% LTV ratio. The total debt outstanding to SBA and JM including this loan totaled $1.7 million.

117.    The actions of McDonald and Chandler in originating and the Director Defendants in approving the SBA loan were negligent, grossly negligent, breached their fiduciary duties and were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, violations of federal banking regulations, failure to undertake or require an adequate pre-approval credit analysis, failure to comply with the Board's underwriting standards for acceptable risk, and failure to comply with the prudent underwriting standards set forth in the Regulatory Guidelines and the Loan Policy.

118.    In addition to the Loan Policy's requirement that a sound credit analysis be done prior to approving the loan, the Loan Policy specifically required that McDonald and Chandler ensure the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions. The Loan Policy also set forth specific underwriting standards to identify the level of risk acceptable to the Board, and required the approval of each real estate loan to reflect the borrower's capacity to service the debt, the overall credit worthiness of the borrower, the value of the mortgaged property, and all other relevant credit features. The origination and approval of the SBA loan violated these Loan Policy requirements as evidenced by, among other things, the following:

    a.  McDonald and the Director Defendants knew the loan failed to comply with the prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the RLL did not include key financial information needed to properly assess the risk, and the documentation of what little information there was, was woefully inadequate.

    b.  McDonald and the Director Defendants knew they lacked information necessary to assess the borrower's capacity to repay the loan. McDonald and the Director Defendants relied entirely on unsupported, unaudited financial statements in assessing the guarantor's strength and the borrower's capacity to repay the loan. Notably absent from the RLL was any income information from the tax returns for JM or SBA; indeed there were no tax returns obtained until mid-2008, and yet the borrower had almost $1.5

53

million in loans outstanding at the time of this request.  The utter failure of McDonald and the Director Defendants to adequately assess the borrower's financial position at origination of this loan was made clear when the tax returns for 2005-2007 were subsequently obtained and showed cumulative income for JM of $29,000 for those years.  SBA's returns showed losses for 2005 and 2006 and income of $18,470 in 2007.

c. Although McDonald reported JM had handled all accounts as agreed, he noted JM had been slow on some payments but never over 30 days. McDonald did not offer any additional information about JM's credit history and there was no credit report in the file.

d. McDonald and the Director Defendants knew or should have known the pre-approval analysis of the loan was inadequate based on the following:

    i. JM's financial statement was signed and dated October 21, 2007, but the financial information presented was as of January 19, 2007, which raised questions about the reliability of the information.

    ii. The RLL stated the borrower had built over $5,000,000 in homes in 2006 and projected net profit after expenses of over $250,000 even though the borrower's 2006 Profit and Loss statement dated January 16, 2007, showed only $39,259 in profit based on gross income of $1,663,802 and the 2005 profit was $32,050 based on gross income of $977,213.

    iii. The RLL stated "per the cash flow analysis, there is ample income to service the global debts with DTI being rated at 38%."  In fact, there was no cash flow analysis in the file, and no underlying support for property values shown on SBA's financial statement.  The one-page cash flow sheet submitted by the borrower consisted primarily of rental projections since only one property was leased (for $650 a month), and did not reflect expenses associated with the rental property such as taxes, insurance, and maintenance.

    iv. The RLL stated that JM's reported personal net worth of $4,264,831 included the $4,035,831 net worth of SBA-- meaning JM's net worth was comprised almost solely of his interest in SBA.  In fact, JM's financial statement showed that over 99% of his total assets were illiquid, and he only had $12,000 in cash.  Similarly SBA's financial statement reflected 91% of its total assets were illiquid, and it only had $7,864 in cash.

e. A substantial portion of the loan was to finance unimproved real estate and for construction of duplexes.  Even though the stated primary source of

repayment was permanent financing, the loan was made without any cost estimates, specific development plans, or a formal take out commitment. Not only did the Director Defendants lack information to assess the primary source of repayment, the Director Defendants approval of the loan violated the Loan Policy provision regarding riskier loans because it was made without acceptable mitigating factors to compensate for additional risk.

    f.   The Loan Policy dictated that lending to contractors was to be on a limited basis and contractor credits were to be handled by loan officers who had been trained in that type of lending. McDonald had no training in lending to residential contractors which should have been evident to the Director Defendants based on McDonald's failure to properly and accurately document and evaluate this loan.

119. The Loan Policy and Regulatory Guidelines set forth LTV ratio limits of 80% on multifamily real estate construction loans. The Loan Policy also provided the amount of a real estate loan should under no circumstances exceed 85% of the lower of the purchase price or the appraised value of the real estate. The RLL reported the LTV ratio as 75% based on the following:

    a.   $143,000 purchase price of the garage;

    b.   the "as is" appraised value of $78,000 for a residential rental property at 613 Boyd;

    c.   $183,000 as completed for duplexes at 615 N. Boyd Street A and 615 N. Boyd Street B ($91,500 each);

    d.   $170,000 as completed for duplexes at W. Madison Street A and B ($85,000 each); and

    e.   $140,000 as renovated for the duplexes at 610 and 612 N Brunson Street ($70,000 each).

The RLL incorrectly reported that JM already owned the property on which the duplexes were to be built and/or remodeled. In fact, the two parcels on Boyd Street which included the home at 613 Boyd and the duplexes at 615A and 615B were transferred to SBA for $57,500 in an arm's

length transaction on November 9, 2007, two days after the loan was approved. Therefore, the total value for the properties for purposes of calculating LTV ratio was $510,500 based on the purchase price for the garage and the Boyd properties plus the appraised value for the remaining properties. Thus, the Director Defendants' approval of this loan violated the Loan Policy and Regulatory Guidelines because the loan exceeded the collateral value resulting in a LTV ratio of 104%.

120.    Federal banking regulations require an appropriate evaluation of real property collateral that is consistent with safe and sound banking practices be obtained. The approval of this loan using the seven appraisals for rental property violated this provision because each appraisal failed to include an evaluation of income-producing property, and did not describe the current and expected use of the property or include an analysis of the property's rental income and expenses even though the RLL relied on rental income in support of the loan request and such information was pertinent to the assessment of the borrower's ability to service the debt. The Loan Policy also required an evaluation of construction loans on the basis of both cost and sales value but the appraisals which were subject to completion of construction contained no cost information.

121.    The borrower began incurring late payments with the first payment due on this loan and consistently incurred late payments thereafter. Only six interest payments were made totaling $19,621, with the last one made on July 8, 2008. The tortious conduct of McDonald and the Director Defendants in connection with this transaction resulted in damages of at least $213,726.

**JB&G Holdings, LLC**

122. Pursuant to the recommendation of McDonald and the approval of the Director Defendants, on October 3, 2007, a $202,133 loan was extended to JB&G Holdings, LLC ("JB&G"). JB&G was a real estate investment company with PG as its sole member. The RLL stated the purpose of the loan was to purchase 117+ acres of land in Lancaster County that had been subdivided into 22 lots. Terms required 11 monthly payments of interest and one payment of principal and interest on October 3, 2008. The primary source of repayment was sale of the lots with "additional repayment from the development loan [PG] will pursue." The secondary source of repayment was real estate equity in property currently held or permanent financing of the lots.

123. The actions of McDonald and Chandler in originating and the Director Defendants in approving the JB&G loan were negligent, grossly negligent, breached their fiduciary duties, were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, failure to undertake or require an adequate pre-approval credit analysis, failure to comply with the Board's underwriting standards for acceptable risk and failure to comply with the prudent underwriting standards set forth in the Regulatory Guidelines and the Loan Policy.

124. In addition to the Loan Policy's requirement that a sound credit analysis be done prior to approving the loan, the Loan Policy specifically required that McDonald and Chandler ensure the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions. The Loan Policy also set forth specific underwriting standards to identify the level of acceptable risk to the Board, and required the approval of each

real estate loan to consider the borrower's capacity to service the debt, the overall credit

worthiness of the borrower, the value of the mortgaged property, and all other relevant credit

features.  The origination and approval of the JB&G loan violated these Loan Policy

requirements as evidenced by, among other things, the following:

a. McDonald and the Director Defendants knew the loan failed to comply with prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the RLL did not include key financial information needed to properly assess the risk.

b. The Director Defendants knew there was no global cash flow analysis, and McDonald and Chandler knew or should have known that the assessment of the guarantor's financial position was inaccurate.  The RLL stated PG's adjusted gross income was $65,928 with a 24% DTI ratio based on PG's 2006 tax return.  The calculation of "adjusted gross income" for PG included wages for her husband and triple counted income from JB&G. PG's actual adjusted gross cash flow was only $14,417 and her debts were $15,540 resulting in a DTI ratio of 107%, more than double the maximum permitted DTI ratio of 45%.

c. McDonald and Chandler knew the RLL reported that PG had cash assets of $81,860, but her financial statement reflected cash of only $9,800.

d. McDonald and the Director Defendants knew they did not have enough information to determine the adequacy of the primary source of repayment. The RLL stated the primary source of repayment was to come from sale of lots; however, the RLL did not include any information about marketability of the lots or rate of absorption.  Moreover, the appraisal reflected the property was unimproved land and had not even been subdivided into lots.

e. The pre-approval analysis of the JB&G loan was inadequate.  McDonald and the Director Defendants knew the loan was made to finance unimproved real estate without specific development plans or a formal take out commitment and violated the Loan Policy provision regarding riskier loans because it was made without acceptable mitigating factors to compensate for the additional risk.

f. McDonald and the Director Defendants knew the loan violated Loan Policy provisions against making loans to borrowers outside the Bank's geographic limitations because PG resided in Florida and the loan was secured by property that was outside the Bank's market.

125. McDonald and the Director Defendants knew the JB&G loan violated both the Loan Policy and the Regulatory Guidelines for real estate loans. Both the Loan Policy and Regulatory Guidelines provided that real estate loans for raw land have a maximum LTV ratio of 65%. The purchase price was $250,000 and a September 24, 2007 appraisal valued the land at $270,000. The LTV ratio for the JB&G loan based on purchase price was 80% and based on appraised value was 75%.

126. The JB&G loan was renewed December 29, 2008, for 90 days with interest only paid monthly; according to the memo requesting the extension, it was 80 days past due at the time. The loan was renewed again on August 3, 2009 but after this renewal JB&G only made one interest payment – 8 days after the renewal. The tortious conduct of McDonald and the Director Defendants in connection with this transaction has resulted in damages of at least $199,619.

**Financial Independence Ministries, LLC**

127. Pursuant to the recommendation of Odom and Chandler and the approval of the Director Defendants, on August 12, 2008, a $79,686 commercial real estate loan was extended to Financial Independence Ministries, LLC ("FIM"). FIM was a single member limited liability company owned by JP. The repayment terms required 35 monthly payments and a balloon payment at maturity on August 12, 2011. The loan was secured by a first mortgage on residential investment property. The primary source of repayment was rental income and secondary repayment source was the sale of properties.

128. The stated purpose of the loan was to refinance a residential rental property JP purchased for $63,500. Odom advised the Director Defendants that JP's debt service coverage

("DSC") ratio would drop to .92:1 with this request. The RLL represented that the drop would be offset with a $60,000 deposit into a reserve account "under total control of the Bank until his DSC had recovered to a 1.25:1 ratio." Including this loan, the aggregated amount of debt outstanding to JP and FIM at the time was over $1.3 million.

129.     The actions of Odom and Chandler in originating, and the Director Defendants in approving the FIM loan were negligent, grossly negligent, breached their fiduciary duties, and were not consistent with prudent banking practices as evidenced by, among other things, their violations of the Loan Policy, failure to undertake or require an adequate pre-approval credit analysis, failure to comply with the Board's underwriting standards for acceptable risk, and failure to comply with the prudent underwriting standards set forth in the Regulatory Guidelines and Loan Policy.

130.     In addition to the Loan Policy's requirement that a sound credit analysis be done prior to approving the loan, the Loan Policy specifically required Odom and Chandler ensure that the loan recommendation was based on an accurate and thorough understanding of the customer's financial needs and conditions. The Loan Policy also set forth specific underwriting standards to identify the level of risk acceptable to the Board, and required the approval of each real estate loan to consider the borrower's capacity to service the debt, the overall credit worthiness of the borrower, the value of the mortgaged property, and all other relevant credit features. The origination and approval of the FIM loan violated these Loan Policy requirements as evidenced by, among other things, the following:

  a.     Odom and the Director Defendants knew the loan failed to comply with prudent underwriting standards in the Regulatory Guidelines and the Loan Policy as the information provided in the RLL did not include key financial information needed to properly assess the risk, and the supporting documentation was inadequate.

60

b.     Odom and the Director Defendants knew the RLL did not contain sufficient information to assess the borrower's repayment capacity because there was no information regarding debt service requirements for FIM, no global cash flow analysis provided, and no cash flow projections or supporting documentation for the rental income and associated expenses.

c.     Odom and the Director Defendants knew that the financial information presented showed that JP did not have the financial capacity to repay the loan. Odom determined that JP's annual debt payments far exceeded his annual income and speculated that only JP's capital gains were supporting his debt load. The RLL stated that JP's DSC ratio was only 0.92, a violation of the Loan Policy's requirement of a DSC ratio of 1.2. Odom calculated average net income for 2006 and 2007 of only $28,428 (which included over $110,000 in capital gains) and annual payments of $211,043. JP's June 2008 credit report reflected over $100,000 in credit card debt, over $95,000 in secured/unsecured loans and lines of credit, and $60,000 in student loan debt.

d.     JP's personal joint income tax returns showed adjusted gross income of negative $42,128 for 2007, which included capital gains of $111,398 and a business loss of $231,848. Odom and the Director Defendants knew that almost 84% of JP's total assets were comprised of real estate holdings, and 96% of FIM's total assets were comprised of real estate holdings.

e.     Odom represented that prior to the loan being closed he would obtain a $60,000 reserve account from JP which would be under the Bank's total control and would obtain an acceptable appraisal. Odom failed to do either.

131.     The Loan Policy provided that the amount of a real estate loan should under no circumstances exceed 85% of the lower of the purchase price or the appraised value of the real estate. The RLL reported the LTV ratio as 75% based on a June 4, 2008 appraised value of $105,000.[4] However, JP had purchased the property a week earlier, on May 28, 2008, and the RLL reported the purchase price as $63,500 resulting in a LTC ratio of 124%. Odom and the

---

[4] This appraisal was apparently unacceptable because Odom represented he would obtain an acceptable appraisal before the loan closed.

Director Defendants knew this loan violated the Loan Policy's maximum LTC ratio of 85% and also violated the Regulatory Guidelines LTV ratio of 80%.

132.    FIM only made four payments on the loan, the last on December 14, 2008.  The tortious conduct of Odom and the Director Defendants in connection with this transaction resulted in damages of at least $78,477.

## VI.    CLAIMS FOR RELIEF

133.    FDIC-R pleads each of the following Counts in the alternative.

## COUNT I – GROSS NEGLIGENCE

134.    The allegations of Paragraphs 1 through 133 of this Complaint are incorporated herein by reference.

135.    As directors and officers of WFNB, the Defendants owed a duty of care to discharge their duties in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances.  This duty of care included, but was not limited to, the following:

    a.    To insure that loans approved by them were underwritten and approved in accordance with the law, regulations, and loan policy applicable thereto and in accordance with prudent banking practices;

    b.    To make all decisions, including those relating to the approval of loans, on the basis of a rational process availing themselves of all material and reasonably available information;

    c.    To faithfully and diligently perform their duties as officers and/or directors of WFNB.

136.    In disregard of their duties, the Defendants failed to exercise that degree of diligence, care, judgment, skill and good faith which an ordinarily prudent person would have exercised under similar circumstances in like positions with respect to the origination and

approval of the transactions identified herein.  The Defendants' failures to exercise reasonable

care, skill, diligence, competence and good faith in the discharge of their responsibilities include,

but are not limited to:

a.    Failing to exercise independent judgment in originating, recommending and approving loans;

b.    Failing to make decisions relating to the origination and approval of loans on the basis of a rational process and failing to avail themselves of all material and reasonably available information;

c.    Permitting and/or performing wholly inadequate analyses of borrower repayment capabilities (e.g., a lack of cash flow analyses, inaccurate computations of cash flow and debt service coverage ratios);

d.    Requiring little or no borrower equity in real estate loans and reliance on collateral (such as the sale of real estate) as a primary source of repayment;

e.    Originating or approving loans with grossly inadequate documentation or verification of borrower income, employment, financial condition or repayment capability and collateral values;

f.    Relying on information, reports, opinions or statements of officers in originating and approving loans with the knowledge that such officers were not reliable or competent in the matter presented;

g.    Approving loan renewals and extensions, including renewal of interest-only loans that violated Bank policies;

h.    Originating or approving loans without adequate sources of repayment;

i.    Originating or approving loans based on real estate appraisals that were not analyzed independently from the lending function;

j.    Originating or approving loans based on inaccurate, flawed, inappropriate and/or incomplete real estate appraisals despite red flags showing these deficiencies;

k.    Originating or approving under secured loans contrary to prudent banking practice; and

l.      Originating or approving loans made in violation of the Loan Policy and
        Regulatory Guidelines with insufficient or nonexistent mitigating factors
        to justify those violations.

137.    The acts and omissions of the Defendants were absent of that degree of care that

was necessary under the circumstances thus constituting gross negligence on the part of the

Defendants.

138.    As a direct and proximate result of the foregoing and other breaches, acts and

omissions of the Defendants, the FDIC-R has suffered damages in excess of $5.674 million.

139.    Pursuant to 12 U.S.C.A. § 1821(k), S.C. Code Ann. § 33-8-300 and S.C. Code

Ann. § 33-8-420, the FDIC-R is entitled to recover from the Defendants all damages sustained as

a result of their gross negligence alleged herein.

## COUNT II – NEGLIGENCE

140.    The allegations of Paragraphs 1 through 133 of this Complaint are incorporated

herein by reference.

141.    As directors and officers of WFNB, the Defendants owed a duty of care to

discharge their duties in good faith, with the care that an ordinarily prudent person in a like

position would exercise under similar circumstances.  This duty of care included, but was not

limited to, the duties set forth in Paragraph 135 (a)-(c) above.

142.    In disregard of their duties, the Defendants failed to exercise that degree of

diligence, care, judgment, skill and good faith that an ordinarily prudent person would have

exercised under similar circumstances in like positions in originating or approving the

transactions identified herein.  The Defendants' failures to exercise reasonable care, skill,

diligence, competence and good faith in the discharge of their responsibilities include, but are not limited to, the failures and breaches of duty set forth in Paragraph 136 (a)-(l) above.

143.     As a direct and proximate result of the foregoing acts of negligence and other breaches, acts and omissions of the Defendants, the FDIC-R has suffered damages in excess of $5.674 million.

144.     Pursuant to 12 U.S.C.A. § 1821(k), S. C. Code Ann. § 33-8-300 and S. C. Code Ann. § 33-8-420, the FDIC-R is entitled to recover from the Defendants all damages sustained as a result of their negligence alleged herein.

## COUNT III - BREACH OF FIDUCIARY DUTIES

145.     The allegations of Paragraphs 1 through 133 of this Complaint are incorporated herein by reference.

146.     Pursuant to applicable federal statutes, regulations and South Carolina law, directors and officers of insured financial institutions, such as WFNB, stand in a fiduciary relationship, and are obligated to discharge the duties of their respective positions in accordance with the standards imposed by applicable laws.

147.     The Defendants owed fiduciary duties, individually and collectively, to exercise the highest degree of loyalty, care, diligence and fair dealing in the course of their duties as directors and officers.  The Defendants duties included, but were not limited to, those set forth in Paragraph 135 (a)-(c) of this Complaint.

148.     The Defendants, individually and collectively, breached their fiduciary duties by failing to exercise that degree of diligence, care, loyalty, judgment and skill required of them in originating and approving the transactions identified herein.

65

149.    The Defendants committed or permitted acts and omissions which resulted in great damage, including, but not limited to, those act and omissions listed in Paragraph 136 (a)-(l) of this Complaint.

150.    As a direct and proximate result of the breaches of fiduciary duty by the Defendants, the FDIC-R has sustained damages in excess of $5.674 million.

151.    Pursuant to provisions of applicable law, the FDIC-R is entitled to recover from the Defendants all damages sustained as a result of the breaches of fiduciary duty alleged herein.

WHEREFORE, THE FDIC-R PRAYS for judgments against the Defendants as follows:

1.    For compensatory, consequential, and other damages, jointly and severally, against Defendants for their negligence, gross negligence, and/or breaches of fiduciary duty that resulted in damages.

2.    For prejudgment and other appropriate interest pursuant to 12 U.S.C. 1821(l) and South Carolina law against all Defendants on amounts for which they are liable.

3.    For the FDIC-R's recoverable costs and expenses incurred in connection with this matter.

4.    For any other relief as the Court may deem just, equitable or proper.

5.    Plaintiff demands a trial by jury on all issues.

Dated:  July 22, 2013                     Respectfully submitted,


                                          /s/ Mark S. Barrow
                                          Mark S. Barrow, Esquire, Fed. ID No. 1220
                                          William R. Calhoun, Jr., Fed. ID No. 5447
                                          Sweeny, Wingate & Barrow, P.A.
                                          1515 Lady Street
                                          Columbia, SC 29201
                                          (803) 256-2233
                                          MSB@swblaw.com
                                          WRC@swblaw.com


                                          Mary L. Wolff
                                          (Motion for Admission *Pro Hac Vice* Pending)
                                          WOLFF ARDIS, P.C.
                                          5810 Shelby Oaks Drive
                                          Memphis, TN 38134
                                          (901)763-3336
                                          (901)763-3376 (fax)
                                          mwolff@wolffardis.com
                                          Wolff TN Bar No. 8262

                                          *Attorneys for Plaintiff*